CARMEN A. TRUTANICH, City Attorney (SBN 86629x)
GARY G. GEUSS, Chief Assistant City Attorney (SBN 128022)
LAURIE RITTENBERG, Assistant City Attorney (SBN 106683)
KIMBERLY A. ERICKSON, Deputy City Attorney (SBN 213634)
ADENA M. HOPENSTAND, Deputy City Attorney (SBN 223857)
200 N. Main Street, City Hall East, Room 916
Los Angeles, CA 90012
Telephone (213) 473-6877
Facsimile (213) 473-6818
kimberly.erickson@lacity.org
adena.hopenstand@lacity.org

Attorneys for Defendant CITY OF LOS ANGELES

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CPR for SKID ROW, et al., <br><br> Plaintiffs, <br> vs. <br> CITY OF LOS ANGELES <br><br> Defendant. | **Case No. LACV 11-6274 JFW (CWx)** <br><br> **DECLARATION OF LIEUTENANT SHANNON K. PAULSON IN SUPPORT OF DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND/OR DECLARATORY RELIEF** <br><br> Date: October 3, 2011 <br> Time: 1:30 p.m. <br> Ctrm: 16 (Hon. John F. Walter) |

DECLARATION OF LIEUTENANT SHANNON K. PAULSON

# DECLARATION OF LIEUTENANT SHANNON K. PAULSON

**I, SHANNON K. PAULSON, DECLARE**:

1.  I am a police officer with the Los Angeles Police Department ("LAPD") assigned to Central Division. I have been a police officer with the Los Angeles Police Department ("LAPD") for 20 years. I have personal knowledge of the facts contained within this declaration and, if I were called to testify to those facts, could and would do so competently.

2.  I have been assigned as the Officer in Charge of the Central Area Safer Cities Initiative ("SCI") Task Force for the past two and half years. The SCI Task Force is assigned to the Central City East, or Skid Row region of Downtown Los Angeles and utilizes community policing efforts to address the narcotics, violent crime, blight and nuisance issues that plague the area. I am specifically tasked with directing both traditional and non-traditional policing efforts and working with the public and private stakeholders in the area to improve the environment for those who live and work in the community.

3.  In support of this effort, I attend numerous regular and ad-hoc community meetings that deal with any issue affecting or influencing the Skid Row region. One such meeting is the monthly Skid Row Walk. This meeting, which has occurred every month for over five years, was originated in a collaborative effort between the Central City East Business Improvement District and the Midnight Mission. It is open to attendance by any and all parties, including concerned community members from within and outside Skid Row, residents, service providers, business owners and employees, volunteers and various faith based and educational organizations. The intent was to educate people on the conditions on Skid Row, bring attention to concerns and issues, collaborate on solutions and address and hold accountable public service organizations such as the police department, sanitation, and public works, as well as elected officials such as the Mayor, City Council members and the City Attorney. The meeting begins with an open gathering of attendees, introductions, question and answer sessions and discussion

regarding concerns or issues. A walk throughout the Skid Row region follows during which attendees physically visit any locations of concern which may have been previously discussed.

4. In order to understand why the arrest of Pete White occurred on July 6, 2011, it is important to present a background of events that occurred over the past four months. The arrest that occurred in July was a culmination of four months worth of aggressive and harassing behavior by Los Angeles Community Action Network ("LA CAN") members that was part of an obvious and calculated plan to intimidate the Skid Row Walk attendees. This deliberate plan by LA CAN members has in fact disrupted and frustrated the entire purpose of the Skid Row Walk. For the past four months, LAPD personnel, including myself, have utilized only verbal warnings in an attempt to control the aggressive behavior of the LA CAN members. These warnings have allowed them to demonstrate and engage in free speech, while informing them that they could not engage in aggressive behavior that targets or diminishes another group's ability to enjoy the same rights. However, these warnings continued to be ignored and disregarded by the LA CAN members, yet their aggressive actions continued to increase month after month.

5. The first day that I attended the Walk and encountered the LA CAN demonstrators was on April 6, 2011. It was 6:00 p.m. and the Skid Row Walk hosts and participants were gathering on the public sidewalk in front of the Midnight Mission. I was present as an invited participant on behalf of SCI and Central Area. There were about twenty walk attendees present. As the participants conducted their walk westbound on 5th Street crossing Towne Ave, I looked south on Towne and observed a crowd of people moving parallel to the Walk on 6th Street in the opposite direction (eastbound). I recognized people in the crowd as affiliates of LA CAN and several were wearing LA CAN apparel. Once the LA CAN members saw the Walk attendees, they proceeded northbound up Towne Avenue and many of the members began running to catch up with the attendees. Once the LA CAN members caught up to the Walk attendees, the members began surrounding the attendees, utilizing whistles and handheld

2

DECLARATION OF LIEUTENANT SHANNON K. PAULSON

blow-horns directed at the attendees, inhibiting their ability to communicate with each other. One of the hosts of the Walk, Ms. Lopez, attempted to move the attendees away from the loud and raucous crowd, but the LA CAN crowd continued to follow them, yelling and repeating statements such as "You don't belong here!" and "These aren't your streets."

6. Ms. Lopez expressed to me her concern for the safety of the Walk attendees and requested my assistance in providing sanctuary and safety for the attendees. Due to the close proximity to Central Area Police Station to where we were, I directed the Walk attendees into the garage entrance of the police station, out of sight, away from the garage entrance. I could hear someone in the crowd yell "Don't come back next time. We don't want you here." I noticed that a number of LA CAN members loitered around the garage entrance for approximately ten minutes, then moved to the front of the police station. The LA CAN members eventually disbanded and the Walk attendees returned to the Midnight Mission once they felt it was safe to leave the garage. Although verbal warnings had been given by LAPD to the LA CAN members on this date, no arrests were made.

7. During the time the LA CAN members rushed the Walk attendees, I observed the members position themselves directly behind the Walk attendees and blow whistles and bullhorns loudly into the Walk attendees personal space. These actions were frequently engaged in from a distance of a foot or two away from the attendees, and were directed at attendees' heads, ears and faces. I observed several of the attendees physically cringe, wince and duck away from those individuals who were yelling, whistling and blowing horns in close proximity to them. I observed other attendees, those who were not under direct assault, attempt to communicate with one another and have to lean towards one another, placing their lips within a few inches of each others' ears in order to be heard. I personally experienced this same requirement as the yelling and raucous noise makers made it impossible to speak and be heard or hear others.

8. On May 4, 2011, I again attended the Skid Row Walk. As the Walk

attendees held the introductory portion of their meeting inside the Midnight Mission building, to avoid any disturbances, I noticed about thirty to forty LA CAN members gathering outside the Midnight Mission. Ms. Lopez, the host, advised me that she wished to avoid any disturbance or confrontation and so was going to exit via a side door away from the LA CAN crowd gathered in front. As the Walk attendees exited the Mission onto the street to commence the Walk, the crowd of LA CAN members caught up with the Walk attendees and proceeded to yell, point fingers and create a disturbance with drums and bullhorns, which prevented any further communication amongst the Walk attendees. The Walk attendees continued to walk down the street in order to escape from the loud, disturbing and intimidating verbal attack by the crowd. However, the LA CAN crowd followed the attendees blowing whistles and positioning themselves in between the Walk attendees, where they were yelling and being disruptive. Some individuals in the crowd were yelling on bullhorns directly into the attendees' ears, making it impossible for the attendees to conduct their meeting on the public sidewalk. One of the loudest and aggressive members of the crowd was yelling "We don't want you here!", "You're not welcome here!" and "We're going to be here every month until you stop walking!"

9.   As the meeting attendees were moving through the streets of Skid Row, attempting to conduct their meeting, they encountered an individual lying on the sidewalk near the curb/gutter. I observed an outreach worker bend down in an attempt to help this individual, however, the worker was quickly surrounded by the loud and hostile LA CAN members. As a result, the worker was forced to abandon his efforts to assist the individual.

10.   I attempted to speak to one of the LA CAN members to inform her that her group was interrupting and disturbing a lawful public meeting and that the group's actions were illegal and could result in arrest, however, the individual looked at me and gave no response. The LA CAN members continued to pursue the Walk attendees by creating loud noise so that the meeting could not be conducted. Despite the attendees'

repeated attempts to specifically move away from the LA CAN group they were followed and stalked relentlessly. As a result, the Walk attendees were unable to conduct their meeting and were forced to prematurely terminate the walk and return to the Midnight Mission. Even though verbal warnings had been given by LAPD to the LA CAN members on this date, no arrests were made.

11. On June 1, 2011, I once again attended the monthly Skid Row Walk. As the Walk attendees gathered in front of the Midnight Mission, they were almost immediately surrounded by a loud and raucous crowd, consisting of LA CAN members. One of the members was utilizing a handheld bullhorn, and as the crowd gathered around the walk attendees, the LA CAN member was berating the walk attendees on the megaphone, making derogatory statements at them. I observed another demonstrator walk to within a foot or two behind the walk attendees to yell at them through the bullhorn with similar statements.

12. I observed Ms. Lopez attempting to relocate the walk attendees away from the disruptive and disturbing noise and verbal attacks, directing them to move approximately fifty feet away from the LA CAN crowd. The LA CAN crowd immediately moved with Ms. Lopez and the walk attendees and again surrounded them, continuing the loud and disruptive yelling and noise making. As Ms. Lopez attempted to conduct a meeting, I observed one of the members in the LA CAN group move toward Ms. Lopez and start yelling over her shoulder into the attendees' group. I then advised this demonstrator that while she had every right to gather and demonstrate, she did not need to be yelling in people's ears with the bullhorn. I also told her that she should not be disrupting a lawful meeting and should not pursue people trying to get away from the noise she was making. She ignored my remarks and went on to position herself behind and at times amongst the walk attendees, directing her handheld bullhorn at their heads and continuing her loud and disruptive behavior. I specifically heard her state, "We're going to be right here by your side, yelling in your ear!" and, "You're not welcome here."

13.     During this time, I observed numerous walk attendees repeatedly cringing in apparent discomfort, holding their ears and turning or attempting to move away from the bullhorn. I also observed a number of the walk attendees motioning to the demonstrators to get the bullhorn out of their face, however, the demonstrators ignored their pleas and continued with the loud noise making tactics and bullhorns in their face maneuver. She even acknowledged the discomfort she was causing, yelling via the bullhorn, "I see you guys putting your hands to your ears."

14.     The walk attendees retreated to the Midnight Mission in an attempt to end the meeting and escape the harassing and assaultive actions from the LA CAN crowd members. I observed the female demonstrator who had continued to blow the blow horn in the walk attendees' ears the entire walk, come up behind the attendees in the group, and when she was approximately six inches from one of the attendees' ears, activated it. I observed the attendee cringe and duck in an attempt to escape the loud acoustic assault. Immediately after the attendee ducked away, I observed another LA CAN crowd member activate an airhorn in one of the attendees' ears and refused to cease and desist, even after the walk attendee begged the demonstrator to cease her noise making assault. When asked to stop, she refused and stated, "Then you need to leave." Although verbal warnings had been given to the LA CAN demonstrators on this date, no arrests had been made.

15.     On July 6, 2011 the Skid Row Walk participants and Ms. Lopez once again gathered in front of the Midnight Mission. Also in attendance were approximately ten to fifteen civilian attendees and two outreach workers. I was also present as an invited guest of the group, along with three other LAPD police officers. Before the meeting commenced, I observed a group of LA CAN members, numbering between forty and fifty, and being led by an individual I recognized as Pete White, approaching on 6th Street. I also recognized a female LA CAN member who was present at the May walk who had loudly disrupted the public Walk by using a bullhorn. Again, on this evening, I

observed this female yelling at the Walk attendees who were gathering in front of the Midnight Mission using a bullhorn.

16. I was approached by two individuals who identified themselves as being legal advisors to the LA CAN group. I advised them that I would have to meet with the leaders of the group, Becky Dennison and Pete White, the self-identified co-directors of LA CAN. I wanted to keep peace and ensure everyone's rights were respected. The legal representatives told me that they would communicate that request to the leaders, including Pete White.

17. As the demonstrators became louder and louder, I observed Ms. Lopez move her meeting attendees down the sidewalk approximately fifty feet in order to avoid the loud noise and to conduct their meeting. Immediately, the demonstrators moved to reposition themselves around the Walk attendees, continuing their loud yelling, drum pounding and use of bullhorns. Again, Ms. Lopez attempted to move her meeting away from the loud disturbance. The loud crowd was being led by Darren White and other LA CAN members.

18. I observed the LA CAN members once again moving to reposition themselves among the Walk attendees and I could tell the group was clearly pursuing the Walk attendees. The Walk attendees continued down the street. I then approached the two previously identified legal advisors for the demonstrators and told them that I needed to immediately meet with Mr. White and Ms. Dennison. I was told that Mr. White and Ms. Dennison had refused to meet with me, and that the legal advisors would pass any communications to them. I informed the legal advisors that the LAPD would protect their right to gather, march or demonstrate, but that their group could not take action that was clearly focused on disrupting the Walk attendees' lawful meeting. The legal advisors assured me that they would communicate this information to Mr. White and Ms. Dennison and I observed the legal advisors walk down the sidewalk where I saw them engage both Dennison and White in conversation.

19. By this time, Ms. Lopez had now led her group down the block and I could still observe Mr. White and the LA CAN group pursuing the Walk attendees. As Ms. Lopez and the Walk attendees stopped at corners to wait to cross the street, they would immediately be crowded and surrounded by the loud LA CAN members, who were yelling, banging on drums and making statements on the bullhorn regarding their intent to disrupt the meeting and drive the attendees out of the community. When the Walk attendees stopped at the corner of 6th St. and Towne to permit an outreach worker to tend to an individual lying on the sidewalk, the demonstrators surrounded them and continued to make the loud and raucous noise.

20. At this time, I again met with the legal advisors and told them that this type of activity could not take place, that they could demonstrate, but they needed to do it from a distance so that the Walk attendees could exercise their right to have their meeting. I again observed the Walk attendees cross the street with the demonstrators directly behind them with the loud drums, yelling and bullhorn broadcasts within only a few feet of the rear of most of the Walk attendees. I was in a position some distance from the crowd and not surrounded by them or the focus of their noise making and yelling, yet even I experienced difficulty communicating and had to lean towards my personnel and speak close to their ears when attempting to give and receive verbal information.

21. Upon reaching the corner of 6th Street and Gladys Street, I observed Ms. Lopez stop the Walk attendees and attempt to speak to them. They were then immediately surrounded by the LA CAN crowd, led by Pete White. At that time I also observed Ms. Dennison giving direction and indicating to the LA CAN crowd to position themselves around the Walk attendees. I observed a female with a bullhorn move adjacent to the group and continue to broadcast via the bullhorn toward Ms. Lopez. I could not hear Ms. Lopez amidst all of the noise made by the LA CAN crowd.

22. For the third time that evening, I spoke with the legal representatives and told them the demonstrators could march, demonstrate and chant, but had to do it from a distance as to not disturb the meeting of the Walk attendees. I told the legal

representatives that any further disturbance would leave me no choice but to make arrests. After the legal reps spoke to Dennison and White, I did notice a temporary reduction in the disruptive activity. The LA CAN group created a gap between them and the walk attendees, following them from a slightly greater distance and I noted that Ms. Dennison had removed the bullhorn from the female who was using it.

23. As the Walk attendees continued to walk up the sidewalk, I observed them stop next to an abundance of trash on the sidewalk next to a business there and begin to discuss something. I then observed Pete White across the street from the Walk attendees, leading the LA CAN group in a chant. I determined that even though the LA CAN group was loud, the distance was sufficient as to not disrupt the meeting to the point that it could not continue.

24. However, after a couple of minutes, I observed Pete White begin waving his arms to the LA CAN crowd and motioning them to follow him. At this point, the LA CAN group began crossing the street toward the Walk attendees while the attendees were still huddled in a group. Upon reaching the attendees, the LA CAN group, led by Pete White, surrounded the Walk attendees, closing in on them within one foot, and began yelling. As I observed this activity, and the reaction of the Walk attendees, it became obvious to me that Mr. White's intent was to disrupt and force the termination of the meeting on the corner. I observed the Walk attendees leaning forward as they appeared unable to hear the discussion. I could hear that Ms. Lopez tried to raise her voice to be heard, however, I could hear Pete White raise his voice even louder and the LA CAN crowd followed his example.

25. By this time, it was obvious to me that the meeting was entirely disrupted and could not continue. After giving the group three prior warnings within thirty-five minutes, observing Pete White's behavior and determining it was his intent to intentionally prohibit another group from holding a lawful meeting, I determined an arrest was appropriate and necessary. I approached Pete White and verbally advised him that he was under arrest and directed officers to take him into custody for a violation of

9

DECLARATION OF LIEUTENANT SHANNON K. PAULSON

1  Penal Code section 403. In completing the arrest report I requested consideration for
2  filing an additional charge for violating Penal Code section 415(2) – Disturbing the
3  Peace.
4      26.  On the April 6, 2011 Skid Row Walk, Los Angeles Police Officers A.
5  Gonzalez (Serial No. 38846) and De La Rosa (Serial No. 38839) accompanied the walk
6  attendees and me through the entirety of the Walk. At one point, Gonzalez and De La
7  Rosa crossed the street to obtain a full visual of the Walk attendees and LA CAN
8  protesters, however, they were in my view the entire time. The Officers recorded the
9  events that occurred during that Walk on the DVD entitled:

> COPY-SID # 457988; SKID ROW MTG AND WALK; APRIL 6,
> 2001; FILMED BY SCI OFFICERS (Attached as Exhibit 1)

Within one to two days after the Walk, I viewed the video footage that was recorded by
Officers Gonzalez and De La Rosa. I also viewed this video again in its entirety prior to
the July 6, 2011 Walk. The events that are recorded on the DVD are a true and accurate
depiction of the events that occurred during the Walk on April 6, 2011.

   27.  On the May 4, 2011 Skid Row Walk, Los Angeles Police Officers Keenan
(Serial No. 38048) and J. Gonzalez (Serial No. 37178) followed the walk attendees in an
LAPD patrol car during the Walk. I gave them direction as to where to go and they were
in my view the entire time. The Officers recorded the events that occurred during that
Walk on the DVD entitled:

> SKID ROW MTG & WALK; COPY-SID#457989;
> MAY 4, 2011; FILMED BY SCI OFFICERS
> COPY-SID #495247 (Attached as Exhibit 2)

Within one to two days after the Walk, I viewed the video footage that was recorded by
Officers Keenan and Gonzalez. I also viewed this video again in its entirety prior to the
July 6, 2011 Walk. The events that are recorded on the DVD are a true and accurate
depiction of the events that occurred during the Walk on May 4, 2011.

DECLARATION OF LIEUTENANT SHANNON K. PAULSON

28. On the July 6, 2011 Skid Row Walk, Los Angeles Audio-Visual Technician Dan Morehead (Serial N1442) accompanied the walk attendees and me through the entirety of the Walk. At one point I had Mr. Morehead step out into the street to get a wide shot of the Walk attendees and LA CAN protesters, however, he was in my view the entire time. Mr. Morehead recorded the events that occurred during that Walk on the DVD entitled:

> SKID ROW MTG & WALK; JULY 6, 2011 BY LAPD
> AUDIO/VID UNIT (Attached as Exhibit 3)

Within one to two days after the Walk, I viewed the video footage that was recorded by Morehead. The events that are recorded on the DVD are a true and accurate depiction of the events that occurred during the Walk on July 6, 2011.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 9, 2011 in Los Angeles, California.

LT. SHANNON K. PAULSON

---

11

DECLARATION OF LIEUTENANT SHANNON K. PAULSON